# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

WELLS FARGO BANK, N.A.,

        Plaintiff,

        v.

EQUINITI TRUST COMPANY,

        Defendant.

Civil Action No. 22-1586-GBW

---

J. Cory Falgowski, BURR & FORMAN LLP, Wilmington, DE; Christian Kemnitz, KATTEN MUCHIN ROSENMAN LLP, Chicago, IL; Rebecca K. Lindahl, KATTEN MUCHIN ROSENMAN LLP, Charlotte, NC.

        *Counsel for Plaintiff*

Dominick T. Gattuso, HEYMAN ENERIO GATTUSO & HIRZELL LLP, Wilmington, DE; John T. Zach, Sabina Mariella, BOIES SCHILLER FLEXNER LLP, New York, NY.

        *Counsel for Defendant*

## **MEMORANDUM OPINION**

February 2, 2026
Wilmington, Delaware

GREGORY B. WILLIAMS
UNITED STATES DISTRICT JUDGE

Pending before the Court are four motions for summary judgment filed by Defendant Equiniti Trust Company, LLC ("Equiniti"), including Equiniti's Motion for Summary Judgment #1 on Plaintiff's Negligent Misrepresentation Claim (D.I. 87), which is fully briefed (D.I. 89; D.I. 111; D.I. 136); Equiniti's Motion for Summary Judgment #2 on Plaintiff's UCC Claim (D.I. 90), which is fully briefed (D.I. 92; D.I. 114; D.I. 138); Equiniti's Motion for Summary Judgment #3 on Plaintiff's Breach of Contract Claim (D.I. 93), which is fully briefed (D.I. 95; D.I. 117; D.I. 140); and Equiniti's Motion for Summary Judgment #4 on Plaintiff's Contractual Indemnification Claim (D.I. 96), which is fully briefed (D.I. 98; D.I. 120; D.I. 142) (collectively, "Equiniti's Motions for Summary Judgment"). The Court has reviewed the relevant briefing, accompanying exhibits, and declarations and for the reasons stated below, the Court grants Equiniti's Motions for Summary Judgment.

## I.    BACKGROUND

This action arises from Equiniti's alleged failure, in its capacity as transfer agent, to timely process and execute Plaintiff Wells Fargo Bank N.A.'s ("Wells Fargo") requests to sell shares of Occidental Petroleum Corporation ("Occidental") stock. The following facts are undisputed unless otherwise noted.

### A.  Formation of the Trust Agreement & Transfer Agent Service Agreement

On May 15, 1995, Anadarko Petroleum Corporation ("Anadarko") and Wachovia Bank of North Carolina, N.A. ("Wachovia")[1] entered into the Anadarko Benefits Trust Agreement ("Trust

---

[1] For clarity and consistency, the Court will, from this point forward, refer to the parties by their current names, as Wells Fargo is the successor in interest to Wachovia (D.I. 1 ¶ 10), and Occidental acquired Anadarko in August 2019 (D.I. 1 ¶ 11).

Agreement"), which created a rabbi trust (the "Trust")[2] for the benefit of Anadarko employees. *See* D.I. 99-15.

On December 7, 2015, Occidental and Wells Fargo executed an agreement (the "Transfer Agent Services Agreement"), where Wells Fargo was to act as a transfer agent and provide services with respect to "the issuance, transfer and registration of securities of the Corporation." D.I. 100-1 at 2.

**B. Equiniti's Assumption of the Transfer Agent Service Agreement**

On July 12, 2017, Wells Fargo entered into an agreement (the "Purchase Agreement") to sell its transfer agent business, Shareholder Services, to Equiniti Group plc. D.I. 99-8. On January 31, 2018, Wells Fargo, Equiniti, and Equiniti Group plc executed an agreement (the "Joinder Agreement"), where Equiniti assumed and became responsible for all of Equiniti Group plc's obligations under the Purchase Agreement. D.I. 99-17 at 3. The next day, on February 1, 2018, Wells Fargo, Equiniti Group plc, and Equiniti entered into an agreement (the "Bill of Sale, Assignment and Assumption Agreement"), where Equiniti assumed and agree to pay, perform and be responsible for, and discharge certain liabilities assigned by Wells Fargo. D.I. 99-17. Following the execution of the Purchase Agreement, Joinder Agreement and Bill of Sale, Assignment and Assumption Agreement, Equiniti assumed Wells Fargo's obligations to Occidental and became Occidental's transfer agent.

---

[2] *See Occidental Petroleum Corp. v. Wells Fargo Bank, N.A.*, 573 F. Supp. 3d 1161, 1163 (S.D. Tex. 2021) ("The agreement the parties entered is known as a rabbi trust because the first such agreement involved a rabbi. The agreement has nothing to do with the rabbinate and is in many ways unlike a conventional trust. A rabbi trust is essentially a bank account set up to hold money set aside for a company's deferred compensation for high level executives, designed to minimize the tax impacts of setting aside the money. The structure used to achieve this tax avoidance uses the word trust, but it is more precisely a bank account in which a company puts money it commits to pay its executive employees and shields that money from certain tax consequences.")

**C. The Plan to Sell Occidental Stock & The Sale of Stock by Wells Fargo's In-House Trading Desk**

On December 19, 2019, Occidental and Wells Fargo agreed to sell Occidental shares, commencing on January 6, 2020, with the sale of 381,420 shares per day throughout the week, and concluding with the final liquidation on January 10, 2020. D.I. 100-3. A total of 1,907,100 shares were designated for sale, comprising 733,500 shares in street name registration[3] held in Wells Fargo's Depository Trust Company ("DTC") account and 1,173,600 shares in direct registration[4] with Equiniti. D.I. 100-4; D.I. 100-5.

On January 6, 2020, Wells Fargo sold the first tranche of 381,420 shares, which were held in street name registration, through its in-house trading desk. D.I. 100-4. On January 7, 2020, Wells Fargo sold a second tranche of 352,080 shares, also held in street name registration, through its in-house trading desk. *Id.* On the same day, Wells Fargo faxed Equiniti a Request Form requesting the sale of 29,430 shares ("January 7, 2020 Request") that were held in direct registration with Equiniti[5]. D.I. 100-6.

---

[3] There are three methods by which a shareholder may hold shares: physical certificate, street name registration and direct registration. *See* D.I. 1 ¶ 35; D.I. 43 ¶ 35. Street name registration "is registered in the name of the brokerage firm on the issuer's books, and the brokerage firm holds the security for the shareholder in the book-entry form (meaning there is no physical certificate, but only an entry on the books denoting ownership)." *Id.*

[4] Direct registration "is registered in the shareholder's name on the issuer's books, and either the issuer or its transfer agent holds the security from the shareholder in book-entry form." D.I. 1 ¶ 35.

[5] Shares held in direct registration may not be sold by the shareholder on the open market. Such shares may be sold through alternative methods, such as, "the shareholder uses a transfer agent to transfer the shares from the shareholder's name to the Direct Registration System ("DRS") into a brokerage account. Once the shares are transferred into street name and deposited in a brokerage account, a broker can sell the shares on the open market." D.I. 1 ¶ 37; D.I. 45 ¶ 37.

### D.  The Sale of 29,430 Shares by Equiniti

On January 8, 2020, Nikki Tanner ("Tanner"), Wells Fargo's investment manager for the Trust, contacted Equiniti to inquire into the status of the January 7, 2020 Request.  D.I. 100-6; D.I. 99-4 at 11:23-12:1; D.I. 99-5.  Tanner spoke to Equiniti representative, Paul Beuning ("Beuning"), who stated that the request was "still active" and "still being processed . . . but it looks like it might not be accepted."  D.I. 99-5 at 4:10-15.  When Tanner inquired as to why the request might not be accepted, Beuning stated that "[t]he reason I see is that it's actually you need a medallion or a valid corporate resolution.  The corporate resolution is missing a notary's signature."  *Id.* at 4:17-20.

Beuning then placed Tanner on hold to reach out to another representative, Michelle, for clarification regarding the request.  *Id.* at 6:11-10:19.  Michelle informed Beuning that a "notary stamp needs to be on the corporate resolution itself," and to inform Tanner that "when we're looking at the document we're not seeing that there's a valid notary stamp."  *Id.* at 7:15-17; 8:25-9:2.  Beuning relayed the information to Tanner.  *See id.* at 10:25-11:5.  Tanner and Beuning discussed options to "to get the seal notarized" or "send in a written [] sales requests that's medallion guarantee stamped."  *Id.* at 12:13-21.  In response to the second option, Tanner indicated that the request needs to be done by the end of the week.  *Id.* at 12:22-13:2.  The call concluded with Tanner stating, "let me call my office and see what can be done."  *Id.* at 13:8-9.  After the call, on January 9, 2020, Tanner submitted a sale request that had a medallion guarantee stamp for 29,340 shares ("January 9, 2020 Medallion Stamped Request").  D.I. 100-10.  On January 13, 2020, Equiniti sold 29,430 shares from the January 7, 2020 Request.  D.I. 100-9.  On January 14, 2020, Equiniti sold 29,430 shares from the January 9, 2020 Medallion Request.  D.I. 100-14.

### E.  The Three Sales Requests of 381,420 Shares

On January 9, 2020, Wells Fargo submitted via mail three sale requests to Equiniti, each seeking the sale of 381,420 plan shares ("Three January 9, 2020 Requests").  D.I. 100-11; D.I.

100-12. On January 16, 2020, Equiniti rejected the Three January 9, 2020 Requests (D.I. 100-15) and mailed a letter to Wells Fargo seeking clarification regarding the number of shares Wells Fargo intended to sell (D.I. 100-16). On February 14, 2020, Tanner contacted Equiniti to inquire into the status of the Three January 9, 2020 Requests. D.I. 99-6. On the call, Equiniti representative, Tening Xiong ("Xiong"), informed Tanner of a letter rejecting the requests sent on January 16, 2020. D.I. 99-6 at 8:2-25. Xiong stated that the rejection was because "all the shares are in DRS shares and when you checked this box you said the shares out of plan share, and so the information didn't match and that's why the request was rejected." *Id.* at 9:13-17. Wells Fargo located the rejection letter unopened on an employee's desk on February 18, 2020. D.I. 99-7 at 112:21-113:13.

On February 18, 2020, a sales request was prepared, but not submitted, requesting the sale of all shares held in direct registration form. D.I. 100-20; D.I. 88 ¶ 35. On March 16, 2020, the stock market declined by 12 percentage points, and Tanner indicated to a colleague that the shares should be brought in-house and held. D.I 100-23 at WF-00007424; D.I. 88 ¶ 36 . On March 18, 2020, Wells Fargo transferred the remaining Occidental shares from Equiniti to Wells Fargo's DTC account. D.I. 100-30; D.I. 100-22. On March 20, 2020, Wells Fargo sold the Occidental shares. D.I. 100-25.

## II.    PROCEDURAL HISTORY

### A. Southern District of Texas Action – Occidental v. Wells Fargo

On April 6, 2021, Occidental sued Wells Fargo in the Southern District of Texas (the "Texas Action"), asserting causes of action for breach of contract, breach of fiduciary duty, and indemnity, and sought recovery of damages caused from the delayed sale of shares. *See* Complaint, *Occidental Petroleum Corp. v. Wells Fargo Bank, N.A.*, No. 4:21-1126 (S.D. Tex. Apr. 6, 2021), Dkt. No. 1. On September 6, 2021, Wells Fargo moved to dismiss two of the three causes of action, filed an answer to Occidental's claim for breach of contract, asserted a counterclaim

against Occidental, and filed a third-party complaint against Equiniti. *See Occidental Petroleum Corp. v. Wells Fargo Bank, N.A.*, No. 4:21-1126 (S.D. Tex. Apr. 6, 2021), Dkt. Nos. 24, 25, 27. The court dismissed Occidental's cause of actions for breach of fiduciary duty and indemnity and Wells Fargo's UCC counterclaim against Occidental. *See Occidental Petroleum Corp. v. Wells Fargo Bank, N.A.*, 573 F. Supp. 3d 1161, 1167-73 (S.D. Tex. 2021).

Occidental filed a second amended complaint. *See Occidental Petroleum Corp.*, No. 4:21-1126, Dkt. No. 55. Wells Fargo filed an answer and counterclaims to the second amended complaint, as well as an amended third-party complaint against Equiniti. *See Occidental Petroleum Corp.*, No. 4:21-1126, Dkt. Nos. 62, 65. The amended third-party complaint was dismissed for lack of personal jurisdiction. *See Occidental Petroleum Corp. v. Wells Fargo Bank, N.A.*, 2022 WL 2223045, at *1 (S.D. Tex. June 21, 2022).

On August 18, 2022, the Southern District of Texas granted summary judgment in Occidental's favor, holding that Wells Fargo was liable for breaching two contracts, and Wells Fargo's counterclaim against Occidental for Equiniti's alleged negligence should be dismissed. *See Occidental Petroleum Corp. v. Wells Fargo Bank, N.A.*, 622 F. Supp. 3d 495, 499-500 (S.D. Tex. Aug. 18, 2022), *aff'd*, 117 F.4th 628 (5th Cir. 2024). On May 31, 2023, the Southern District of Texas granted Occidental's motion for summary judgment on damages and entered a $38 million final judgment against Wells Fargo. *See Occidental Petroleum Corp. v. Wells Fargo Bank, N.A.*, 2023 WL 3739083, at *11 (S.D. Tex. May 31, 2023).

**B. Instant Action – Wells Fargo v. Equiniti**

On December 13, 2022, Wells Fargo brought the instant action against Equiniti asserting claims for negligent misrepresentation, negligence, breach of contract, negligence/contribution, violation of UCC §§ 8-401 and 8-407, and contractual indemnification under the Purchase Agreement. *See generally* D.I. 1. On March 17, 2023, Equiniti moved to dismiss Wells Fargo's

claims. D.I. 12.  On June 29, 2023, Equiniti's motion to dismiss was denied without prejudice to Equiniti to renew within 21 days.  D.I. 22.  On July 20, 2023, Equiniti filed a renewed motion to dismiss seeking dismissal of all claims brought by Wells Fargo.  D.I. 23.  The matter was referred to Magistrate Judge Fallon for resolution, who recommended that the Court grant the renewed motion to dismiss as to the negligence claims and deny the motion in all other respects.  D.I. 31; D.I. 32.  Both parties filed objections and responses.  D.I. 33; D.I. 34; D.I. 35; D.I. 36.  The Court overruled the parties' objections and adopted Magistrate Judge Fallon's Report and Recommendation, granting-in-part and denying-in-part Equiniti's renewed motion to dismiss.  D.I. 40.  On August 6, 2025, Equiniti filed four motions for summary judgment.  D.I. 87; D.I. 90; D.I. 93; D.I. 96.

## III.    LEGAL STANDARD

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  Material facts are those "that could affect the outcome" of the proceeding. *Lamont v. New Jersey*, 637 F.3d 177, 181 (3d Cir. 2011) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).  "[A] dispute about a material fact is 'genuine' if the evidence is sufficient to permit a reasonable jury to return a verdict for the nonmoving party." *Id.*  "The burden on the moving party may be discharged by pointing out to the district court that there is an absence of evidence supporting the non-moving party's case." *Peloton Interactive, Inc. v. iFIT Inc.*, No. 20-1535, 2022 WL 1523112, at *1 (D. Del. May 13, 2022) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)).

The burden then shifts to the non-movant to demonstrate the existence of a genuine issue for trial. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986); *Williams*

8

*v. Borough of West Chester*, 891 F.2d 458, 460-61 (3d Cir. 1989). A non-moving party asserting that a fact is genuinely disputed must support such an assertion by: "(A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . , admissions, interrogatory answers, or other materials; or (B) showing that the materials cited [by the opposing party] do not establish the absence . . . of a genuine dispute . . . ." Fed. R. Civ. P. 56(c)(1).

When determining whether a genuine issue of material fact exists, the court must view the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in that party's favor. *Wishkin v. Potter*, 476 F.3d 180, 184 (3d Cir. 2007). If the non-moving party fails to make a sufficient showing on an essential element of its case with respect to which it has the burden of proof, the moving party is entitled to judgment as a matter of law. *See Celotex Corp.*, 477 U.S. at 322.

## IV.    DISCUSSION

### A.    The Court Grants Equiniti's Motion for Summary Judgment #1 on Plaintiff's Negligent Misrepresentation Claim

Equiniti contends that Wells Fargo's negligent misrepresentation claim is barred by Delaware's economic loss doctrine and therefore, summary judgment should be entered in its favor. For the reasons discussed below, the Court agrees that Wells Fargo's claim is barred by the economic doctrine.

Under Delaware law, a claim for negligent misrepresentation requires a plaintiff to prove: "(1) a pecuniary duty to provide accurate information; (2) the supplying of false information; (3) failure to exercise reasonable care in obtaining or communicating information; and (4) a pecuniary loss caused by justifiable reliance upon the false information." *Westfield Ins. Co. v. Chip Slaughter Auto Wholesale, Inc.*, 717 F. Supp. 2d 433, 446 (D. Del. 2010). Delaware has adopted the

economic loss doctrine, which "precludes recovery in negligence for losses that are solely economic in nature." *Snowstorm Acquisition Corp. v. Tecumseh Prods. Co.*, 739 F. Supp. 2d 686, 710 (D. Del. 2010); *see also Kuhn Constr. Co. v. Ocean & Coastal Consultants, Inc.*, 844 F. Supp. 2d 519, 526 (D. Del. 2012) ("The economic loss doctrine is a judicially created doctrine that allows a party to recover in tort only if losses are accompanied by bodily harm or property damage; in other words, the doctrine prevents plaintiffs from recovering in tort for losses suffered that are solely economic in nature.").

Delaware recognizes an exception to the economic loss doctrine, whereby a plaintiff may invoke a claim for negligent misrepresentation by showing that (1) the defendant supplied information to the plaintiff to use in business transactions with third parties, and (2) the defendant is in the business of supplying such information. *Livery Coach Sols., L.L.C. v. Music Express/East, Inc.*, 245 F. Supp. 3d 639, 646 (D. Del. 2017)); *see also Restatement (Second) of Torts* § 552. Equiniti contends that the second prong of the exception cannot be met because it is not in the business of supplying such information. The Court agrees.

First, Equiniti contends that the scope of its duties and obligations is set forth in, and circumscribed by, the Transfer Agent Services Agreement (D.I. 100-1). D.I. 89 at 8. Specifically, Equiniti claims that its duties include "issuing securities, transferring stock, countersigning new share certifications, paying dividends to shareholders, and maintaining records." *Id.* Second, pursuant to the terms and conditions of its DRS Share Sale Program (D.I. 100-2), Equiniti contends that it does not provide investment advice. *Id.*

In response, Wells Fargo argues that Equiniti falls within the exception to the economic loss doctrine because a transfer agent's business, among other duties, is to "provid[e] information that makes such transfers possible, lawful, and reliable." D.I. 111 at 6. Wells Fargo further alleges

that "a transfer agent's work product is the creation, maintenance and timely dissemination of reliable information (*e.g.*, shareholder list, share ownership, transaction confirmations, dividend payments, compliance reports.)." *Id.* at 5. Accordingly, Wells Fargo asserts that "transfer agents *are* like accountants, financial advisors, and title searchers," because the core of their work and "process is informational at every stage[.]" *Id.* at 6. Wells Fargo contends that Equiniti is an information provider based on the duties enumerated in the Transfer Agent Services Agreement, which require "Equiniti to maintain ownership records, process transfers and issue confirmation – all informational tasks." *Id.* at 6-7. Wells Fargo further argues that this is also reflected in federal regulations, which confirms that a transfer agent's core obligations include supplying information to third parties and ensuring accuracy, timeliness, and safeguarding. *Id.* at 7.

"The point where one crosses the line into the business of supplying information has not been definitively resolved by Delaware courts." *Korber Supply Chain US, Inc. v. DOT Holdings Co.*, No. 24-236, 2025 WL 485957, at *5 (D. Del. Feb. 13, 2025) (cleaned up). To determine whether Equiniti is in the business of supplying information, this Court "must conduct a case-specific inquiry, looking to the nature of the information and its relationship to the kind of business conducted." *Kuhn Constr. Co*, 844 F. Supp. 2d at 527. "A defendant is in the business of supplying information where information is the end and aim product of defendant's work. But, where the information supplied is merely ancillary to the sale of a product or service . . . defendant will not be found to be in the business of supplying information." *Genesis FS Card Servs., Inc. v. Lenovo (United States), Inc.*, No. 22-1385, 2023 WL 2563159, at *7 (D. Del. Mar. 17, 2023) (cleaned up).

The evidence, taken in a light most favorable to Wells Fargo, shows that Equiniti is not in the business of supplying information. Pursuant to the Transfer Agent Services Agreement, Equiniti's contractual obligations are narrowly circumscribed to "provid[e] services for issuers of

11

securities," such as, "the issuance, transfer and registration of securities . . . ." D.I. 100-1 at 2. As to issuance, "the Transfer Agent is authorized and directed to issue such number of shares of the Corporation as may be authorized for issuance . . . [.]" *Id.* With respect to transfers, "[t]he Transfer Agent is authorized and directed to make transfers from time to time upon the books of the Corporation." *Id.* at 4. Lastly, as to registration, "[t]he Transfer Agent is authorized and directed to maintain records showing the name and address of, and the number of securities issued to each holder . . . ." *Id.* at 5. Equiniti's obligations are thus confined to the performance of expressly defined services. Furthermore, Equiniti's DRS Share Sale Program states that, Equiniti "does not provide investment recommendations advice with respect to transactions made through the program." D.I. 100-2 at EQ_00000338; *see also* D.I. 99-2 at 14:13-17 ("As a transfer agent, we don't provide advice to shareholders concerning the means by which they should or whether or not they should execute a transaction.")

The Court concludes that Equiniti's role as a transfer agent is not meaningfully distinguishable from that of the engineer in *Kuhn* retained for a construction project. In *Kuhn*, the court explained that an engineer's work is directed toward a tangible end product, a structure or system, and any information, plans, and specifications supplied are incorporated into that finished product. *Kuhn Constr. Co*, 844 F. Supp. 2d at 527-28 ("[I]n the usual course of events, architects and engineers provide information, plans, and specifications that are incorporated into a tangible product, building, or structure[.]"). Therefore, the engineer is not in the business of supplying information, as the value of the service lies in the execution of the product. *Id.* ("Put differently, defendants who produce plans and drawings for a construction project are not in the business of supplying information since the information they provide is ancillary to the sale of their finished product."). The same is true here for Equiniti as a transfer agent. The information Equiniti

supplied to Wells Fargo regarding the status of the January 7, 2020 Request was incidental to Equiniti's services as transfer agent, which are limited to the issuance, transfer, and registration of securities. *See* D.I. 100-1 at 2. The information provided was only as a part of, and in furtherance of, Equiniti's contractual obligation as transfer agent, rather than as a distinct service that Wells Fargo relied upon independently. *See Christiana Marine Serv. Corp. v. Texaco Fuel & Marine Mktg.*, No. 98C-02-217WCC, 2002 WL 1335360, at *7 (Del. Super. Ct. June 13, 2002) (quoting *Tolan & Son, Inc. v. KLLM Architects, Inc.*, 308 Ill. App. 3d 18, 29, 719 N.E.2d 288, 298 (1999)) ("businesses that supply . . . non-informational good or services . . . may exchange information, [but] the information relates only to the goods or services and, thus, is supplied incidental to the sale of the product."); *see also Genesis FS Card Servs., Inc.*, 2023 WL 2563159, at *7. Thus, Equiniti is not in the business of providing information, because any information regarding the status of the January 7, 2020 Request was supplied incidental to its services.

Wells Fargo cannot satisfy the exception to the economic loss rule. Accordingly, Wells Fargo's claim for negligent misrepresentation is barred by the economic loss rule, and Equiniti's Motion for Summary Judgment #1 is granted.

## B. The Court Grants Equiniti's Motion for Summary Judgment #2 on Plaintiff's UCC Claim

Wells Fargo seeks relief, in the alternative, against Equiniti under Uniform Commercial Code ("UCC") §§ 8-401 and 8-407, claiming that Equiniti is liable due to its failure and refusal to timely transfer and register shares of Occidental stock. D.I. 1 at ¶¶ 134-143. Equiniti moves for summary judgment on Wells Fargo's claim, claiming that (1) the sale of Occidental shares is governed by the terms and conditions outlined in Equiniti's DRS Share Sale Program ("Terms and Conditions") (D.I. 100-2) and (2) UCC § 8-401 does not apply to Wells Fargo's requests to sell Occidental shares. D.I. 92 at 1.

Equiniti contends that the conduct at issue, Equiniti's alleged failure to timely sell shares, is governed by the Terms and Conditions, which defines the timing and conditions of performance required of Equiniti in the sale of shares. *Id.* at 3. The DRS Share Program "allows [Wells Fargo] to sell any or all of [the Trust's] direct registration (book-entry) shares without first transferring them to a broker." *Id.*; *see also* D.I. 100-2 at EQ-00000337. The Terms and Conditions state that, "shares will be sold within 5 business days of [Equiniti's] receipt of [Wells Fargo's] properly complete instructions," and directions to sell at specific day or price cannot be accepted. *Id.* at EQ_00000338. Therefore, Equiniti contends, the Terms and Conditions govern because it concerns the very conduct underlying Wells Fargo's claim. D.I. 92 at 3. In response, Wells Fargo argues the Terms and Conditions cannot govern absent "a finding that the Terms and Conditions constitute a contract between Wells Fargo and Equiniti. That finding is a determination for the factfinder." D.I. 114 at 2. However, a factfinder is only necessary when there is a genuine dispute as to an issue of material fact. *See J.F. Feeser, Inc. v. Serv-A-Portion, Inc.*, 909 F.2d 1524, 1526 (3d Cir. 1990) ("[Q]uestions of material fact remain for the factfinder."). The Court finds that no genuine dispute exists here because both parties explicitly agree that a contract was formed by the Terms and Conditions. *See* D.I. 114 at 2 ("Wells Fargo agrees that a contract was formed"); D.I. 92 at 2 ([T]he parties were free to establish their own agreement as to how to proceed with the sale of OXY shares, which they did here via the contractual Terms and Conditions."). Moreover, the conduct at issue concerns Equiniti's alleged failure to timely sell shares through its DRS Share Program, which is squarely governed by the Terms and Conditions.

Equiniti contends that, since the conduct at issue is governed by the Terms and Conditions, § 8-401 does not apply. D.I. 92 at 3-5. Wells Fargo claims that § 8-401 applies because "UCC's use of transfer encompasses a sale of uncertificated securities – every sale is a transfer that must

14

be registered." D.I. 114 at 5. However, Wells Fargo's argument lacks support and fails because Wells Fargo conflates two distinct concepts. UCC § 8-401, codified as 6 Del. C. § 8-401, "obligates an issuer, or its transfer agent, to take the required steps to record a sale of its stock when the seven preconditions in the statute have been satisfied." *Campbell v. Liberty Transfer Co.*, No. 02-3084, 2006 WL 3751529, at \*10 (E.D.N.Y. Dec. 19, 2006). Failure to perform that duty may cause harm and damages may be awarded for a statutory violation. *Id.*; see also *POSCO Energy Co. v. FuelCell Energy, Inc.*, 560 F. Supp. 3d 747, 755 (S.D.N.Y. 2021) (applying 6 Del. C. § 8-401). The conduct at issue concerns a request to *sell* shares through its DRS Share Program, not a request to *register a transfer or record a sale*. The requested sale never occurred and, consequently, no transfer was presented for registration.

Furthermore, in the Texas Action, Wells Fargo brought a counterclaim against Occidental under § 8-401 based on "Equiniti's alleged failure to register the transfer of Occidental shares," the same conduct now alleged against Equiniti. *Occidental Petroleum Corp. v. Wells Fargo Bank, N.A.*, 573 F. Supp. 3d 1161, 1172 (S.D. Tex. 2021). The court explained that "submitting a stock transfer request to Equiniti in the form of a medallion-stamped directions to sell on January 8 and 9, 2020 . . . does not address the clear requirement of § 8-401 to present a qualifying instruction to register the stock." *Id.* The Court reaches the same conclusion here. Accordingly, Wells Fargo's claim fails as a matter of law, and Equiniti's Motion for Summary Judgment #2 on Wells Fargo's UCC Claim is granted.

### C. The Court Grants Equiniti's Motion for Summary Judgment #3 on Plaintiff's Breach of Contract Claim

Equiniti moves for summary judgment on Wells Fargo's breach of contract claim, arguing that Wells Fargo cannot prove the requisite elements. D.I. 95. Wells Fargo claims that Equiniti breached the terms and conditions of the DRS Share Sale Program by executing an unauthorized

sale of 29,340 shares and failing to timely execute the sales of the Three January 9, 2020 Requests. D.I. 1 ¶ 119.

"[T]he elements of a breach of contract claim are: (1) a contractual obligation; (2) a breach of that obligation by the defendant; and (3) resulting damage to the plaintiffs." *Greenstar, LLC v. Heller*, 814 F. Supp. 2d 444, 450 (D. Del. 2011). With respect to the first element, the parties do not dispute that a contractual obligation was created by the request forms and the terms and conditions of the DRS Share Program. *See generally* D.I. 92; D.I. 117 at 2 ("Wells Fargo also pled that various sales request forms it submitted are also contracts . . ."). The Request Form states, in pertinent part:

> All requests will be executed in accordance with the terms and conditions defined in your plan documents and/or Share Sale Program. Once a sale has been submitted to Shareowner Services, it cannot be modified or cancelled. You are unable to direct the time or price at which the share will be sold. The share price may fall or rise during the period between a request for sale, its receipt by Shareowner Services, and the actual sale in the open market. This price risk is assumed by the shareowners.

D.I. 100-10 at EQ_00000017. Additionally, the terms and conditions of the DRS Share Sale Program ("Terms and Conditions") provide, in relevant part:

> Once received, all sale requests are final and cannot be cancelled. Sales are subject to market conditions and other factors. Directions to sell shares on a specific day or at a specific price cannot be accepted under the program. The actual sale date or price received for any shares sold through the program cannot be guaranteed. . . . Shares will be sold within 5 business days of EQ's receipt of your properly completed instructions (except where deferral is necessary under state or federal regulation).

D.I. 100-2 at EQ_00000338.

### 1. Alleged Breach - Unauthorized Execution of 29,340 Shares

With respect to the second element, Equiniti contends that its execution of the second request for 29,340 shares, the January 9, 2020 Medallion Stamped Request, did not constitute a breach because the Request Form and Terms and Conditions explicitly state that, "once a Request

Form is submitted, it is final and cannot be withdrawn, cancelled, or modified." D.I. 95 at 3. Equiniti further asserts that Wells Fargo's alleged damages attributable to the pandemic-driven decline in stock prices are misplaced, as the transaction was executed in January, prior to any significant market volatility. *Id.* at 5. In response, Wells Fargo places its focus on the January 8, 2020 call between Tanner and Beuning. D.I. 117 at 3; D.I. 99-5. Wells Fargo claims that, on the call, "Tanner indicated she was planning to submit the [January 9, 2020 Medallion Stamped Request], asked multiple questions about it, and received explicit directions," and also indicated the sale needed to be done by the end of the week. D.I. 117 at 3. Wells Fargo further claims that "[a] jury could reasonably conclude that Tanner believed the [January 7, 2020 Request] would be rejected, and that the [January 9, 2020 Medallion Stamped Request] replaced it[,]" thereby, "raising genuine issues of material fact about whether executing both requests breach its obligations." *Id.* at 4.

Wells Fargo has failed to establish that a genuine dispute of material fact exists with respect to its breach of contract claim regarding the January 7, 2020 Request[6] and the January 9, 2020 Medallion Stamped Request. "When interpreting a contract, Delaware courts give priority to the parties' intentions as reflected by the terms located within the four corners of the agreement. If a contract term is clear and unambiguous, it must be given its ordinary and usual meaning. *M.M. by Thomas v. Red Clay Consol. Sch. Dist.*, No. 18-423, 2019 WL 2117646, at *4 (D. Del. May 15,

---

[6] The Court notes that Wells Fargo raises, for the first time, a theory that a breach occurred through the execution of the January 7, 2020 Request – an allegation neither pleaded nor implied in the Complaint. *Compare* D.I. 117 at 2 ("Wells Fargo alleged four breaches: (i) executing the [January 7, 2020 Request] after representing to Wells Fargo that it would not . . .") *with* D.I. 1 ¶ 119 ("Equiniti breached the contract by executing an unauthorized sale of 29,340 shares on January 14, 2020 and failing … to timely execute and register the transfers and sales . . . requested . . . on January 9, 2020.); *see also Holton v. Henon*, No. 22-16220, 2023 WL 5814782, at *2 (3d Cir. Sept. 8, 2023) (citing *Wasco Prods., Inc. v. Southwall Techs., Inc.*, 435 F.3d 989, 992 (9th Cir. 2006) ("Summary judgment is **not** a procedural second chance to flesh out inadequate pleadings.").

2019). "To be 'unambiguous' a contract clause must be reasonably capable of only one construction." *John Wyeth & Bro. Ltd. v. CIGNA Intern. Corp.*, 119 F. 3d 1070, 1074 (3d Cir. 1997). The Request Form and the Terms and Conditions clearly and unambiguously state that, once a sale request is received, it cannot be modified or cancelled. *See* D.I. 100-10 at EQ_00000017; D.I. 100-2 at EQ_00000338. Therefore, Equiniti acted in accordance with the Request Form and the Terms and Conditions.

To the extent that Wells Fargo maintains that the call on January 8, 2020 constitutes an agreement with Equiniti that it would not process the January 7, 2020 Request, Wells Fargo fails to offer any evidence supporting this claim. At no time did Beuning represent to Tanner that the January 7, 2020 Request would certainly be rejected or not executed. *See* D.I. 99-5. At the onset, Beuning relayed that the request was "still active" and "still being processed," but "might not be accepted." *Id.* at 4:11-15. Tanner's belief that the request would be rejected cannot be used to contradict the clear, unambiguous language of the agreements. *See Thomas v. Marta*, No. 88C-MY-78, 1990 WL 35292, at *2 (Del. Super. Ct. Mar. 27, 1990) ("The mental purpose of one of the parties to a contract cannot change its terms nor are indefinite expressions sufficient to establish a binding agreement to change the formal requirements of a written contract."); *see also Benchmark Invs. LLC v. Pacer Advisors, Inc.*, 2024 WL 3567367, at *7 (Del. Super. Ct. July 29, 2024).

### 2. Alleged Breach – Failure to Execute the Three January 9, 2020 Requests

Equiniti did not breach its contractual obligation with respect to the Three January 9, 2020 Requests. The Terms and Conditions state, "[s]hares will be sold within 5 business days of EQ's receipt of your properly completed instructions (except where deferral is necessary under state or federal regulations)." D.I. 100-2 at EQ_00000338. On January 16, 2020, Equiniti mailed Wells Fargo a letter confirming that multiple requests had been received and seeking clarification

regarding the total number of shares requesting to be sold. *See* D.I. 100-16 at WF-00000044 ("In order for us to complete the processing of the request, we will require the following: Please clarify the total number of shares you would like to sell."). According to internal documents, Equiniti was unable to determine the number of shares to be sold on the face of the requests, given an ambiguity as to whether the numerical figure included a decimal point or a comma. *See* D.I. 100-15. As a result, Wells Fargo did not properly complete the requests, and Equiniti exercised its discretion to seek additional clarification prior to processing.

Wells Fargo's manufactured disputes are unpersuasive and do not affect the Court's analysis. *See* D.I. 117 at 4-6. Regardless of whether Equiniti sought clarification due to an insufficient number of plan shares available or an ambiguity on the face of the requests, Equiniti acted in accordance with the Terms and Conditions, which require receipt of a properly completed request. For these reasons, Wells Fargo has failed to establish a genuine dispute as to any material fact with respect to its claim for breach of contract. Furthermore, since no breach occurred by Equiniti, Wells Fargo is not entitled to damages. Accordingly, Equiniti's Motion for Summary Judgment # 3 is granted.

### D. The Court Grants Equiniti's Motion for Summary Judgment #4 on Plaintiff's Contractual Indemnification Claim

In its Complaint, Wells Fargo seeks relief against Equiniti based on contractual indemnification under the Purchase Agreement. D.I. 1 ¶¶ 144-152. Wells Fargo claims that Equiniti is required to indemnify against any damages arising out of Occidental's claim against Wells Fargo, including reasonable attorney's fees and costs in defending Occidental's claims. *Id.* ¶ 152; D.I. 120 at 2. Equiniti moves for summary judgment on Wells Fargo's claim, contending that Occidental's claim against Wells Fargo does not fall under Equiniti's obligation to indemnify Wells Fargo under the Purchase Agreement. D.I. 98 at 1.

In Delaware, the interpretation of contracts is a matter of law for the court to determine. *See Rhone-Poulenc Basic Chems. Co. v. Am. Motorists Ins. Co.*, 616 A.2d 1192, 1195 (Del. 1992). A court's interpretation of a contract "will give priority to the parties' intentions as reflected in the four corners of the agreement." *GMG Capital Invs., LLC v. Athenian Venture Partners I, L.P.*, 36 A.3d 776, 779 (Del. 2012) (citing *Paul v. Deloitte & Touche, LLP*, 974 A.2d 140, 145 (Del. 2009)). "In upholding the intentions of the parties, a court must construe the agreement as a whole, giving effect to all provisions therein." *E.I. du Pont de Nemours and Co. v. Shell Oil Co.*, 498 A.2d 1108, 1113 (Del. 1985) (citations omitted). If a contract's terms are clear and unambiguous, the court will interpret such terms according to their ordinary and usual meaning. *See Paul*, 974 A.2d at 145.

The parties dispute the interpretation of the indemnification provision within the Purchase Agreement. The Purchase Agreement between Wells Fargo, as seller, and Equiniti[7], as buyer, is for the purchase and sale of Shareholder Services, Wells Fargo's transfer agent business. *See* D.I. 99-8. Article IX of the Purchase Agreement outlines the parties' indemnification obligations. *Id.* at 56-61. Specifically, Section 9.3 defines Equiniti's obligation, as the buyer, and provides, in relevant part, that "Buyer shall indemnify, defend and hold harmless Seller . . . from and after the Closing Date from and against any and all Damages incurred by [Seller] to the extent caused by (i) . . . , or (ii) any Assumed Liability." *Id.* at 57. Section 2.4 defines Assumed Liabilities and states, in pertinent part, that:

> Subject to the terms and conditions set forth herein, effective from and after the Closing, Buyer will assume and agree to pay, perform, be responsible for and discharge the following (and only the following) Liabilities (collectively, the "Assumed Liabilities"):

[7] Equiniti assumed and became responsible for all of Equiniti Group plc's obligations under the Purchase Agreement through the execution of the Joinder Agreement. D.I. 99-17 at 3.

. . .

> (d) all Liabilities of whatever kind and nature to the extent arising out of or relating to the operation or conduct of the Business or . . . , in each case, from and after Closing.

*Id.* at 16-17. Under the Purchase Agreement, Business means "the marketing, sale and provision of products and/or services offered by Seller's Corporate Client Shareowner Services business as of the Closing, which consist of (a) transfer agent products and services [.]" *Id.* at 3. Closing is defined under Section 2.7 as "the closing of the Transaction," which occurs on a date based on the fulfillment of certain conditions. *Id.* at 18. Closing Date is "the date on which the Closing actually occurs." *Id.* at 4. Altogether, these provisions establish that Equiniti shall indemnify, defend, and hold harmless Wells Fargo, after and from the Closing Date, from and against any and all damages incurred by Wells Fargo arising out of or relating to the operation or conduct of the marketing, sale and provision of products and/or services offered by Wells Fargo's Share Services business, as of the Closing Date, which consist of its transfer agent products and services. *Id.* at 3, 16-17, 57. Plainly stated, Equiniti shall indemnify Wells Fargo for any and all damages arising from the operation or conduct of the transfer agent business as operated on the closing date.

The dispositive issue is whether the conduct at issue arises or relates to the transfer agent business. Equiniti argues that the conduct arises from Wells Fargo's "trustee and fiduciary services for which Wells Fargo was found liable to [Occidental] in the Texas Action," and therefore is not related to or arose from the transfer agent business. D.I. 98 at 5. Wells Fargo contends that its claim "stems for Equiniti's dereliction of its duties as transfer agent." D.I. 120 at 5. In the Texas Action, the court held that Wells Fargo is liable to Occidental due to (1) "Wells Fargo['s] fail[ure] to implement what it agreed to do to prudently manage the Trust, in breach of its obligations under the Trust Agreement" and (2) "Wells Fargo's failure to sell the shares as agreed, before its communications with Equiniti began." *Occidental Petroleum Corp.*, 622 F. Supp. 3d at 517 (S.D.

Tex. 2022).

The Court agrees and finds that Wells Fargo's claim arises from its contractual duties as trustee under the Trust Agreement and, importantly, from its failure to sell shares as agreed *prior to the commencement of its communications with Equiniti*.  Therefore, the claim does not arise from or relate to the operation or conduct of the transfer agent business.  Accordingly, Wells Fargo's claim does not fall under the indemnification provision.  Wells Fargo has failed to show any factual disputes that would permit denial of Equiniti's motion.  Thus, the Court grants Equiniti's Motion for Summary Judgment No. 4 on Wells Fargo's claim for contractual indemnification.

## V.    CONCLUSION

For the foregoing reasons, the Court grants Equiniti's Motion for Summary Judgment #1 on Plaintiff's Negligent Misrepresentation Claim (D.I. 87), Equiniti's Motion for Summary Judgment #2 on Plaintiff's UCC Claim (D.I. 90), Equiniti's Motion for Summary Judgment #3 on Plaintiff's Breach of Contract Claim (D.I. 93), and Equiniti's Motion for Summary Judgment #4 on Plaintiff's Contractual Indemnification Claim (D.I. 96).  The Court also denies Equiniti's Request for Oral Argument (D.I. 144) and Wells Fargo's Request for Oral Argument (D.I. 145) as moot.

An Order consistent with this Memorandum Opinion will be entered.